UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Roger James Berry,

Petitioner,

vs. REPORT AND RECOMMENDATION

Michael O'Keefe, Commissioner of Human Services,

Respondent. Civ. No. 02-775(DWF/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 20th day of February, 2003.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, under Title 28 U.S.C. §2254, and upon the Respondent's Motion to Dismiss.

The Petitioner has appeared by Robert A. Gibson, Esq., and the Respondent has appeared by Michael E. Burns, Assistant Minnesota Attorney General.

For reasons which follow, we recommend that the Respondent's Motion to Dismiss be denied, as without merit, but that, nevertheless, the Petition for a Writ of Habeas Corpus also be denied, and the case dismissed with prejudice.

FEB 2 0 2003

## II. Factual and Procedural History

On April 22, 1996, the Petitioner was civilly committed as Mentally Ill and Dangerous ("MID"), to the Minnesota Security Hospital ("MSH"), in St. Peter, Minnesota, by Order of the Redwood County District Court. He was later provisionally discharged from his commitment to the Chain of Lakes Halfway House, where he currently resides. He has brought his current Petition, seeking release from confinement on the ground that his continued civil commitment is unconstitutional.

The Petitioner's commitment to MSH followed an incident, in April of 1995, when the Petitioner violently attacked his wife in the presence of his children. As a result of that act, the Petitioner was charged with Attempted Murder in the First Degree, Attempted Murder in the Second Degree, Assault in the First Degree, Assault in the Second Degree, and Making Terroristic Threats. As a defense to those charges, the Petitioner asserted that he was not guilty by reason of mental illness. Due to the Petitioner's extensive history of mental illness and chemical dependency,[1] the

---

[1]The Petitioner has been diagnosed with numerous mental illnesses, including Borderline Personality Disorder, Dysthymic Disorder, Organic Brain Syndrome, Alcohol Dependence, Polysubstance Abuse, Antisocial Personality Disorder, Drug-Induced Psychosis; Substance-Induced Psychotic Disorder; Organic Personality Syndrome; Cannabis Dependence, Narcissistic Personality Disorder, Passive-Aggressive Personality Disorder, and Character Disorder. See, (continued...)

prosecutor for Redwood County agreed to dismiss the criminal charges against the Petitioner if he were civilly committed. Accordingly, on January 8, 1996, the Redwood County District Court proceeded with a civil commitment Hearing to determine whether the Petitioner was MID.

At the Hearing, Dr. John Patrick Cronin, who is a licensed psychologist, and who was retained by the Petitioner, testified as the only expert witness. Dr. Cronin testified that the Plaintiff suffered from Borderline Personality Disorder, Depression, and an Organic Brain Syndrome, and had a substantial substance abuse history. Dr. Cronin testified that the Petitioner needed treatment for each of those disorders, and recommended that he spend two to three years in an intensive inpatient treatment facility, followed by a structured half-way house setting. Dr. Cronin also testified that, although the Petitioner's mental illness was aggravated by his substance use, the illness also existed independently, as did his dangerousness.

The Petitioner also testified at the Hearing, detailing his serial failures in chemical dependency treatment programs, and admitting that the longest he had stayed sober, following his seven

---

[1](...continued) Exhibits 1-3 attached to Motion to Dismiss Petition for Writ of Habeas Corpus.

attempts at treatment, was four months. He further admitted that four months was the longest he had ever gone without being physically violent to himself, or to others. Based on the evidence presented, the State District Court found the Petitioner was MID and, pursuant to Minnesota Statutes Section 253B.18, Subdivision 1, committed the Petitioner to MSH, where he was admitted on January 19, 1996.

In 1998, the Petitioner petitioned the Respondent for a full discharge from his commitment. Minnesota law sets up a procedural framework to be followed by persons seeking discharge from commitment. See, Minnesota Statutes Section 253B.18. Initially, the person must file a Petition for discharge with the Commissioner. Id. at Subdivision 5. A Special Review Board ("SRB") then considers that Petition, and makes a recommendation to the Commissioner. Id. at Subdivision 4(c). The SRB may only recommend granting such a Petition upon a finding that the patient "no longer needs inpatient treatment and supervision, is no longer dangerous to the public, and is capable of making an acceptable adjustment to open society." Id. at Subdivision 15. When determining whether to recommend, or grant, a discharge, the SRB, and the Commissioner, are required to consider whether conditions exist that will provide a reasonable degree of protection to the general public, and that will aide the patient's assimilation into the community. Id. If

such conditions do not exist, then the patient cannot be discharged. Id.

A person's discharge from commitment is rarely immediate. Generally, persons who have been civilly committed as MID, are discharged gradually. Commonly, the patient first is placed on a "Pass Plan," which provides for a temporary, unsupervised, absence from MSH. Id. at Subdivisions 4a and 4b. If the patient is successful on a Pass Plan, the patient may be transferred to an open hospital, and if successful there, he may be placed on a "Provisional Discharge Plan," which sets conditions for discharge which, if not followed, could result in a revocation of the discharge. Id. at Subdivisions 6-12. Then, if the patient is successful in the provisional discharge, he or she may be fully discharged from commitment. Id. at Subdivision 15. There is, however, no requirement that a committed person move through each of those steps in order to obtain a full discharge.[2]

Under these Rules, the Commissioner may only order the full discharge of a patient, if the SRB has recommended discharge. Id. at Subdivision 15. Once the Commissioner has made a decision, on whether to grant or deny a patient's petition for release, the patient, or the relevant County Attorney, may ask the Supreme Court

[2]For example, the Petitioner was not placed on a Pass Plan prior to being transferred to an open hospital setting.

Appeal Panel ("SCAP") -- a panel composed of three appointed State District Court Judges -- to conduct a de novo review the Commissioner's decision. See, Minnesota Statutes Section 253B.19, Subdivisions 1 and 2. In that proceeding, the patient bears the burden of going forward with the evidence and, if that initial burden is met, then the party opposing the discharge bears the burden of proving, by clear and convincing evidence, that the patient is still in need of commitment.

The SRB met to consider the Petitioner's Petition for a full discharge on July 8, 1998. See, Exhibit 5 attached to Motion to Dismiss Petition for Writ of Habeas Corpus ("Respondent's Motion"). Finding that the Petitioner's lack of behavioral control was the result of brain damage and cognitive impairment, which was caused by the Petitioner's long-term chemical abuse, and noting that the Petitioner had refused to participate in any form of treatment during his commitment, the SRB recommended that the Commissioner deny the Petitioner's Petition for full discharge. Accordingly, on July 29, 1998, the Commissioner issued an Order which denied the Petitioner's Petition.

The Petitioner petitioned the SCAP for review of the Commissioner's decision. In an Order dated February 9, 1999, the SCAP affirmed the Commissioner's denial. See, Exhibit 4 attached to Respondent's Motion. In so doing, the SCAP noted that the Peti-

tioner had argued that he was not mentally ill, and never had been, and the SCAP determined that its function was not to second-guess the committing Court's assessment, but was required to assume that, at the time of commitment, the patient was mentally ill. The SCAP did find that the Petitioner's mental illness was in remission, as he was unable to use alcohol or other drugs while committed, but that, since the Petitioner had no insight into his chemical addiction, he constituted a "serious risk of returning to drug and alcohol use and exacerbating his mental illness." Id.

The Petitioner did not seek a review of the SCAP's denial of his Petition. Instead, he enrolled in a chemical dependency program at the Saint Peter Regional Treatment Center. On September 21, 1999, while still in that treatment program, the Petitioner filed a second petition, seeking either full discharge, provisional discharge, or a transfer to an open hospital. See, Exhibit 9, attached to Respondent's Motion. This time the SRB recommended and, on February 7, 2000, the Commissioner approved, a transfer to an open hospital. The Petitioner's requests for a provisional, or full discharge, were not recommended by the SRB, and were denied by the Commissioner. The Petitioner sought a reconsideration, by the SCAP, of only his request for a full discharge. See, Exhibit 1, attached to Respondent's Motion, at 3. On July 21, 2000, the Commissioner's denial of the Petitioner's Petition for a full dis-

charge was affirmed. In upholding that denial, the SCAP found that there was a significant risk that, if the Petitioner were fully discharged, he would return to using drugs or alcohol, which would cause a resurgence of his mental illness, that was then in remission. The SCAP concluded that the Petitioner should spend some additional time in an open hospital, in order to ensure that he had gained sufficient insight into his condition, so as to permit him to remain abstinent upon his release.

The Petitioner appealed the SCAP's decision to the Minnesota Court of Appeals, which affirmed that decision on March 27, 2001. See, In re the Matter of Berry, 2001 WL 290516 (Minn.App., March 27, 2001), reh'g denied (Minn.App., May 29, 2001). The Court of Appeals found that, despite some evidence supporting the Petitioner's discharge, the Record as a whole supported the SCAP's determination that, until the Petitioner "spen[t] enough time in an open hospital setting to determine whether [his chemical dependency] treatment ha[d] given him sufficient insight into his condition to allow him to maintain abstinence and sobriety, he [was] still a danger to the public." Id. at *3. The Court further held that, under the established law in Minnesota, that type of gradual release from commitment satisfied the requirements of Due Process. Id. On May 29, 2001, the Minnesota Supreme Court denied further review of the Court of Appeal's decision.

On May 2, 2001, during the pendency of the State Court's review of his Petition of September of 1999, for a full release, the Petitioner again appeared before the SRB -- this time requesting a provisional discharge. Again, the SRB found that, despite the fact that the Petitioner was not exhibiting any signs of mental illness, that his substance abuse history made him a risk to others. Based upon those findings, the Commissioner granted the Petitioner a provisional discharge to the Chain of Lakes Halfway House, where he could continue treatment for his chemical dependency.

On March 6, 2002, the SRB considered yet another Petition from the Petitioner. Although the Petition originally requested either a full, or provisional discharge, at the time of the Hearing before the SRB, the Petitioner withdrew his request for a full discharge. See, Exhibit 8, attached to Respondent's Motion, at 4. The SRB recommended that the Petitioner's provisional discharge be amended, so as to permit him to move home to the Lower Sioux Reservation in Morton, Minnesota, as he requested. By Order dated March 12, 2002, the Commissioner approved that amendment. Despite receiving that discharge, the Petitioner still resides at Chain of Lakes Halfway House.[3]

---

[3]We have no information from the Petitioner as to why he has (continued...)

The Petitioner has now brought his Petition for Writ of Habeas Corpus raising two related claims. The Petitioner maintains that he is no longer mentally ill or dangerous, and accordingly, that his continued confinement is unlawful. According to the Petitioner, he has been evaluated by numerous mental health professionals, who have all opined that he is not mentally ill, and is not a danger to himself or the public. The Petitioner maintains that the State continues his confinement "on the vague assumption that he might commit a crime in the future, or that he might abuse alcohol or drugs if he is granted a full discharge," and that this violates his due process rights. Petition for Writ of Habeas Corpus, at 4.

In response, the Respondent contends that we should summarily dismiss the Petitioner's Petition because he has failed to exhaust all of his available State Court remedies. The Respondent does acknowledge that the Petitioner has fully exhausted his State remedies as to his Petition for a full discharge, that was brought on September 21, 1999, and admits that, "[i]f the inquiry ended here, consideration of the [P]etition might be appropriate." Respondent's Motion, at 11. However, as related by the Respondent, the

---

[3](...continued)
not yet left the Chain of Lakes Halfway House, and this election on his part, does not render his Petition moot, for here he seeks to constitutionally review a denial of a full release, and not the grant of a provisional discharge.

argument ignores the subsequent Petitions, that were filed by the Petitioner, as well as the fact that he did not appeal the denial of those Petitions. According to the Respondent, the Petitioner's failure to appeal those rulings demonstrates that the Petitioner has not exhausted his State Court remedies. Further, the Respondent argues that, since the Petitioner has received exactly what he asked for at his last two SRB Hearings, he cannot now claim that the State has wrongfully denied him relief that he has not sought.

The Petitioner responds by asserting that his Petition for Habeas relief concerns only his request, in September of 1999, for a full discharge. He maintains that, since he fully exhausted his State remedies as to that Petition, he should not be precluded from having a Federal Court review his case "merely because he continues to seek the relief he desires in separate and distinct proceedings brought in different years." Petitioner's Response to Respondents Motion to Dismiss, at 3-4.

## III. Discussion

### A. Whether the Petition must be Dismissed for Failure to Exhaust.

Since a finding that the Petitioner has failed to exhaust his State remedies would preclude any need to reach the merits of his Petition, we necessarily address that threshold issue first.

1. Legal Analysis. Habeas review is limited to a determination of whether an individual is held in violation of the United States Constitution, or the laws or Treaties of the United States. Title 28 U.S.C. § 2254(a). Further, Section 2254(b)(1)(A) prohibits the issuance of a Writ of Habeas Corpus "unless it appears that * * * the applicant has exhausted the remedies available in the courts of the State * * *." Accordingly, a State prisoner, who seeks Federal Habeas relief, must first exhaust his State remedies by presenting the State Courts with a fair opportunity to rule upon the claims presented in his Federal Petition. See, O'Sullivan v. Boerckel, 526 U.S. 838, 841 (1999)(concluding that, in order to satisfy the exhaustion requirement, a petitioner must give the State Court of last resort a chance to review the case, even if the Court has discretionary control over its docket); Duncan v. Henry, 513 U.S. 364, 365 (1995)(stating that exhaustion requires State prisoners to "fairly present" Federal claims to the State Courts); Rose v. Lundy, 455 U.S. 509, 515 (1982)(ruling that a Federal Court must dismiss a Petition when it contains both exhausted and unexhausted claims); Dixon v. Dormire, 263 F.3d 774, 777 (8th Cir. 2001); Mills v. Norris, 187 F.3d 881, 883 (8th Cir. 1999); Joubert v. Hopkins, 75 F.3d 1232, 1240 (8th Cir. 1996); Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996); Krimmel v. Hopkins, 56 F.3d 873, 875-76 (8th Cir. 1995). The exhaustion requirement is based upon

principles of federalism and comity, and is designed to give the State Courts the first opportunity to correct any alleged constitutional defects in the State Court proceedings. See, O'Sullivan v. Boerckel, supra at 842; Rose v. Lundy, supra at 518-19.

In this context, a claim has not been "fairly presented" to the State Courts unless the same factual grounds, and legal theories, which are asserted in the Federal Habeas Petition, have been properly raised in the State Court proceedings. See, Duncan v. Henry, supra at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); Abdullah v. Groose , supra at 411 ("A prisoner must 'fairly present' not only the facts, but also the substance of his federal habeas corpus claim."); Krimmel v. Hopkins, supra at 876. To satisfy the "fairly presented" requirement, a State prisoner is required, in the State proceedings, to have "'refer[red] to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.'" Abdullah v. Groose, supra at 411-12, quoting Ashker v. Leapley, 5 F.3d 1178, 1179 (8th Cir. 1993); see also, Frey v. Schuetzle, 151 F.3d 893, 897 (8th Cir. 1998); Wyldes v. Hundley, 69 F.3d 247, 251 (8th Cir. 1995)("To satisfy the fair presentation

requirement, we traditionally demand that a habeas petitioner have presented 'the same legal theories and factual bases to the state courts,'" although "it is not necessary to cite 'book and verse on the federal constitution.'")[citations omitted]; McDougald v. Lockhart, 942 F.2d 508, 510 (8th Cir. 1991)("Explicit citation to the Constitution or to a federal case is necessary for fair presentation of a constitutional claim in state court.").

2. Legal Analysis. As a start, we note our concurrence with the parties' recognition that the Petitioner has fully exhausted the required State Court remedies as to his Petition, in September of 1999, for a full discharge from his commitment. We disagree, however, with the Respondent's assertion, that we are precluded from reviewing the Petition because of the Petitioner's subsequent Petitions for a provisional discharge.

Generally, we are precluded from considering "mixed bag" Petitions; that is, Petitions in which a petitioner has raised both exhausted, and unexhausted claims. See, Rose v. Lundy, supra at 515. Thus, if the Petitioner included any unexhausted claims in his Petition, we would be obligated to dismiss the Petition, in its entirety. However, here, we find no unexhausted claims for our review. In addition to the Petition for a full release in September of 1999, the Petitioner has petitioned the Commissioner on three other occasions. The first was his request for a full dis-

charge, in 1998, which was denied by the Commissioner. Admittedly, the Petitioner did not appeal that denial beyond the SCAP. While it is clear that the Petitioner did not fully exhaust his State Court remedies as to that request for release, it is equally clear that he has not asserted any claims relative to that request, in his current Petition. Accordingly, we conclude that the Petitioner's failure to exhaust his Petition for a full release, in 1998, does not preclude our review of the instant Petition.

As to the other two Petitions that were submitted by the Petitioner, after his Petition in September of 1999, we note that, in each of those, he requested only a provisional discharge, and those Petitions were granted.[4] According to the Respondent, these facts make it "clear that [the] Petitioner has not exhausted his [S]tate remedies." Respondent's Motion at 11. The Respondent claims that the "Petitioner is well aware that he can appeal a denial of full discharge to [the] SCAP and then through the Minnesota appellate courts, as he has done in the past," but did not do so. Id. The Respondent goes on to claim that, since the Petitioner "received exactly what he asked for in his last two SRB

[4]As we have previously related, in the second of those Petitions, the Petitioner did, initially, seek full release from his commitment. However, at the SBA Hearing on that Petition, he withdrew that part of his Petition, and as a result, the only issue presented to the SBA was the propriety of a provisional, and not a full release.

hearings, [he] cannot now claim that the state has wrongfully denied him of relief that he did not seek," and urges that the "[P]etitioner can still challenge his continuing commitment by filing a new discharge petition," and then fully exhausting any available State Court remedies if, or when, it is denied. Id. at 11-12.

We disagree. In his subsequent Petitions, the Petitioner only sought a provisional release, and his requests were granted. As the Petitioner was successful in those Petitions, we are unable to ascertain what further steps the Respondent believes the Petitioner should have taken in order to exhaust those claims. The Respondent has pointed us to no authority, and we have found none, to suggest that a civilly committed individual must always request full release from commitment, or that a patient who has requested provisional release, and is granted such relief, must thereafter appeal that decision, on the basis that he or she was not granted a request for full release, which had never been submitted. Plainly, when the Petitioner was successful in obtaining a provisional release, he had fully exhausted his State Court remedies as to those Petitions for that relief. As a result, we find that the Petitioner has exhausted his subsequent claims concerning his commitment, and is entitled to Federal Habeas review of his Petition, in

September of 1999, for a full release.[5] Therefore, we proceed to a consideration of the merits of the Petition for Habeas relief.

B. Whether the Denial of the Petitioner's Application for Full Release Violated his Due Process Rights.

The Petitioner has sought Habeas relief on two, related grounds.[6] He contends that it is a denial of Due Process to con-

[5]We wish to make clear that, in our considered view, the fact that the Petitioner was granted a provisional release has no effect on our review of the Petition, in September of 1999, for a full release. In the event that we find no constitutional error as to the denial the Petition in September of 1999, our determination would have no impact, insofar as we can ascertain, on the Petitioner's current provisional release. Likewise, if we find that the State Court's decision, on the Petition in September of 1999, did not comport with the Constitution, and that, as a matter of Due Process the Petitioner was entitled to full release at that time, the Petitioner's current provisional release would not preclude his full release. In sum, other than baldly claiming a failure to exhaust, the Respondent offers nothing to persuade us that the exhaustion question is impacted, in any real way, by the Petitioner's other requests for a provisional release.

[6]While we can understand the Respondent's election to expend the least amount of time to address the Petitioner's Habeas request, we find its failure to address the merits of his claims to be improvident, at best. In Browder v. Director, Department of Corrections of Illinois, 434 U.S. 257, 269, n. 14 (1978), the Supreme Court noted that a Motion to Dismiss is not the prescribed means of responding to a Habeas Corpus Petition. While other Federal Courts have subsequently explained that Browder preceded the enactment of the Rules Governing Section 2254 Cases in the United States District Courts, which provide additional flexibility in Federal Habeas proceedings, the Respondent would do well to address the merits of a Petition for a Writ of Habeas Corpus, in order that his views could be expressed where, as here, we find his procedural objections to be without merit. See, e.g., Tomoney v. Warden, SCI Graterford, 2002 WL 1635008 at *2 (E.D. Pa., July 17, 2002); Mic-
(continued...)

tinue the commitment of an individual, who is no longer mentally ill, or dangerous. According to the Petitioner, his continued commitment is unconstitutional because it is based "on the vague assumption that he might commit a crime in the future, or that he might abuse alcohol or drugs if he is granted a full discharge," and not upon a finding that he is mentally ill or dangerous.

1. Standard of Review. In 1996, Congress restricted the scope of a Federal Court's review of Habeas Petitions, when the underlying claims were adjudicated in State Court. See, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). A Federal District Court's authority to vitiate State Court decisions, through the grant of a Writ of Habeas Corpus, is now limited to a narrow class of claims, which have been fully exhausted in the State Courts, and which involve an adjudication that either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

[6](...continued)
kelson v. United States, 2002 WL 31045849 at *2 (D. Minn., September 10, 2002),; Bostic v. Carlson, 884 F.2d 1267, 1270 n. 1 (9th Cir. 1989); Rothstein v. Pavlick,1990 WL 171789 at *3 (N.D. Ill., November 1, 1990). Instead, the Respondent sits in silence on the merits of the Petition -- we are not afforded the luxury of such a state of apparent indifference.

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

Title 28 U.S.C. §2254(d).

In a recent Supreme Court decision, the Court explained that the "contrary to," and "unreasonable application" clauses of Section 2254(d)(1), present two separate grounds on which a Federal Court may grant Habeas relief to claims adjudicated in the State Courts. Williams v. Taylor, 529 U.S. 362 (2000). The Court went on to instruct, as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decide[d] a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case.

Id. at 413.

The Court further explained that a consideration of a State Court's decision, under the "unreasonable application" clause, requires a Federal Court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id.

Thus, under this heightened standard of review, Federal Courts "may not issue the writ simply because that court concludes in its

independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly," but "[r]ather, that application must also be unreasonable." Id.; see also, Siers v. Weber, 259 F.3d 969, 972-73 (8th Cir. 2001)(examining the impact of Williams on Habeas proceedings); Newman v. Hopkins, 247 F.3d 848, 850-51 (8th Cir. 2001); Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000).

As a consequence, Williams affirmed the distinction, which had previously been drawn by several Circuit Courts, that the "contrary to" clause was to be used in cases addressing pure questions of law, whereas the "unreasonable application" clause addressed mixed questions of fact and law. See, Evans v. Rogerson, 223 F.3d 869, 872 (8th Cir. 2000)(the "in custody" determination for Miranda purposes is a mixed question of law and fact that is properly reviewed under the "unreasonable application clause of §2254(d)(1)"); Becerrill v. Stearns, 2001 WL 1669398 *3 (7th Cir., Dec. 14, 2001) (District Court improperly analyzed question of fact under "unreasonable application" clause, believing it to be a mixed question of fact and law); see also, Neelley v. Nagle, 138 F.3d 917, 924 (11th Cir. 1998), cert. denied, 525 U.S. 1075 (1999); Sweeney v. Parke, 113 F.3d 716, 718 (7th Cir. 1997); Drinkard v. Johnson, 97 F.3d 751, 767 (5th Cir. 1996). Therefore, when a petitioner argues that the State Court improperly applied clearly established Supreme Court

law to a particular set of facts, the Federal Courts may not grant a Writ absent a finding that such an application was unreasonable.

Additionally, Section 2254(e)(1) retains a presumption of correctness for all purely factual determinations, which are rendered by a State Tribunal, and which can, as a result, only be rebutted by the production of clear and convincing evidence to the contrary. Despite this presumption, Section 2254(d)(2) authorizes the issuance of a Writ if the State Court Judgment "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001); McDonald v. Bowersox, 101 F.3d 588, 592 (8th Cir. 1996)("We presume state court findings of fact to be correct in habeas proceedings unless the petitioner establishes, the respondent admits, or the record shows otherwise."), cert. denied, 521 U.S. 1127 (1997). Thus, "[f]actual findings by the state court 'shall be presumed to be correct,' a presumption that will be rebutted only 'by clear and convincing evidence.'" Kinder v. Bowersox, supra at 538, citing Title 28 U.S.C. §2254(e)(1).

2. Legal Analysis. The Petitioner claims that the discharge provision is unconstitutional on its face, and as applied to him, because the provision authorizes confinement of persons who are not mentally ill and who are no longer dangerous, out of a

concern that such a person might, at some time in the future, become either mentally ill, or dangerous, or both. Thus, the Petition presents a mixed question of fact and law, as we must determine both whether the State Court identified the correct governing legal principle, as well as whether it reasonably applied that principle to the facts of this case. As we have noted, in conducting that review, the State Court's factual determinations are entitled to a rebuttable presumption of correctness.

Our analysis commences with a review of the commitment and discharge statutes, which are here at issue. Under Minnesota Statutes Section 253B.18, Subdivision 15, a person may be committed as MID upon a showing, by clear and convincing evidence, that he is mentally ill, and that, as a result of that mental illness, he is dangerous to the public. The Statute defines an individual who is MID, as follows:

> A * * * person (a) who is mentally ill; and (b) who as a result of that mental illness presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious harm on another.

Minnesota Statutes Section 253B.02, Subdivision 17.[7]

---

[7]The Statute further defines a mentally ill person as follows:

(continued...)

As to a patient's eligibility for discharge, the Statute provides as follows:

> A [MID] patient shall not be discharged unless it appears to the satisfaction of the [C]ommissioner, after a hearing and a favorable recommendation by a majority of the [SRB], that the patient is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision.
>
> In determining whether a discharge shall be recommended, the [SRB] and [C]ommissioner shall consider whether specific conditions exist to provide a reasonable degree of protection to the public and to assist the patient in adjusting to the community. If the desired conditions do not exist, the discharge shall not be granted.

<u>Minnesota Statutes Section 253B.18, Subdivision 15.</u>

---

[7](...continued)

> [A]ny person who has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which is maniested by instances of grossly disturbed behavior or faulty perceptions and poses a substantial likelihood of physical harm to self or others as demonstrated by:
>
> > (1) a failure to obtain necessary food, clothing, shelter, or medical care as a result of the impairment;
> >
> > (2) a recent attempt or threat to physically harm self or others.

<u>Minnesota Statutes Section 253B.02, Subdivision 13(a)</u>.

In his appeal to the Minnesota Court of Appeals, the Petitioner argued, as he does here, that, because there is no evidence that he is currently mentally ill, or currently a danger to himself or others, his continued confinement is unconstitutional. In rejecting that argument, the Court of Appeals relied on the Minnesota Supreme Court's decision in Lidberg v. Steffen, 514 N.W.2d 779, 783 (Minn. 1994).

In Lidberg, the Court confronted an individual who sought a full release from his commitment as MID. The SCAP had found that the patient "continued to be mentally ill; that while he did not need to be institutionalized, he continued to need treatment and supervision which would not be available to him if he lived on his own; and that he would be a danger to himself if not supervised." Id. at 782. On appeal to the Minnesota Court of Appeals, the patient argued that the discharge provisions denied him substantive due process, and equal protection. When the Court of Appeals agreed with the patient, an appeal was taken to the Minnesota Supreme Court.

The Supreme Court started its analysis by identifying the relevant constitutional standards concerning civil commitment, and expressly recognized that the United States Supreme Court had held that "[a] state may deprive a person who is mentally ill and dangerous of his or her liberty by confinement to a mental institution

without violating due process until such time as that person is no longer mentally ill or is no longer a danger to himself." Id. at 782, citing Addington v. Texas, 441 U.S. 418, 425 (1979). Further, the Court noted that "[d]ue process requires 'that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.'" Id., quoting Jackson v. Indiana, 406 U.S. 715, 738 (1972).

We conclude that the Minnesota Supreme Court, in Lidberg, "identifie[d] the correct governing legal principle from [the Supreme Court's] decisions," concerning the constitutionality of the civil commitment of the mentally ill. Williams v. Taylor, supra at 413. Therefore, by relying on Lidberg, the Court of Appeals also identified the proper governing precedent for its review of the Petitioner's claims. As a result, our analysis turns to whether the Court of Appeals reasonably applied that legal principle to the facts of the Petitioner's case.

In considering the Petitioner's appeal, the Court noted that the SCAP had determined that the Petitioner had not, initially, participated in any treatment, but had, by the time of his Hearing before the SCAP, become "actively involved in treatment." Id. at *2. The Court then observed that the SCAP had concluded that there was a risk that, if the Petitioner were granted a full release, he would return to using drugs and alcohol and that, in turn, would

"caus[e] a resurgence of his mental illness, which [was then] in remission." Id. Based upon this finding, the SCAP had concluded that the Petitioner needed to spend a "sufficient amount of time," in a hospital setting, in order to ascertain whether his treatment would permit him to maintain his abstinence. Id. The Court also took note that the SCAP had found insufficient support in the Record for a full discharge, until the Petitioner had demonstrated, for a sufficient period of time, "that he ha[d] gained insight into his condition and the strength to pursue his goal, he still represent[ed] a danger to the public." Id.

The Court of Appeals then addressed the Petitioner's argument that he had "produced sufficient evidence to sustain findings that he is capable of making an acceptable adjustment to open society, that he is no longer dangerous to the public, and that he is no longer in need of inpatient treatment and supervision." Id. The Court of Appeals acknowledged that Dr. Cronin had testified to that effect, but that Dr. Cronin had stated that he would only support the Petitioner's full release if the Petitioner agreed to comply to a list of terms and conditions, and that, although the Petitioner said that he would voluntarily comply with such terms, he objected to such terms being made a condition for his release. Id. at *2-3.

The Court of Appeals also summarized the relevant testimony of Dr. John K. Kluznick, who had recommended that the Petitioner have

a period of transition, to an open hospital, before a full discharge. The Court of Appeals related that, when Dr. Kluznick was asked whether the Petitioner could make an acceptable adjustment to open society, he had testified that he did not know, noting that it would depend on the Petitioner's ability to maintain his sobriety, and that only if the Petitioner could remain abstinent, could he make such an adjustment. Dr. Kluznick had testified further that the Petitioner was not a danger to the public as he sat at the Hearing, but that he would be, if he started to use alcohol or drugs again. Id. at *2.

The Court recounted that, when asked whether the Petitioner needed inpatient treatment and supervision, Dr. Kluznick had replied that he did not believe that the Petitioner had ever needed treatment for a psychiatric disorder beyond chemical dependency, but that a transfer to an open hospital would provide for "a smoother and supervised transition into the community." Id. Dr. Kluznick testified that he would not recommend a full discharge because, "[g]iven the nature of [the Petitioner's] commitment and the risk of his returning to violence with the use of chemicals," he believed that the Petition needed supervision. Id. The doctor concluded that, if the Petitioner were to "relapse[] and return[] to intoxicants," that he would "be in serious trouble in terms of

relapse into psychosis and risk of violence at that time." Id. at *3.

The Court of Appeals concluded that, even though the Record contained some evidence to support the Petitioner's request for a full discharge, the Record as a whole sustained the SCAP's finding that, until the Petitioner had demonstrated, through time spent in an open hospital, that his treatment had provided him with sufficient insight into his condition so as to allow him to maintain his sobriety upon release, the Petitioner remained a danger to the public. In so concluding, the Court commented on the Petitioner's history of violence, which was precipitated by his use of chemicals, and that, despite eight prior attempts at treatment, he had failed to remain sober for more than four months at any one time. Lastly, the Court found that, "[e]ven if [the Petitioner's] prospects for success [we]re favorable, success ha[d] not been demonstrated." Id.

We find no fatal deficiency in the Court of Appeal's factual findings, as we have recounted them. Given the deference to which those findings are entitled, we concur in the State Court's determination that the Petitioner had presented an insufficient evidentiary basis to undermine the Court's adoption of the SCAP findings, including its assessment that, while the Petitioner's mental illness was in remission, he had not yet demonstrated sufficient

insight into his condition to allow him to maintain his abstinence and sobriety, and therefore, he "still represent[ed] a danger to the public." Both of the testifying physicians, which have been referenced by the Petitioner, agreed that some additional supervision was needed in order to allow the Petitioner to make an adjustment into the community. While the doctors disagreed about the form that the supervision should assume -- with Dr. Cronin suggesting a provisional discharge, and Dr. Kluznick recommending a stay in an open hospital -- both doctors rejected the full discharge, that the Petitioner had requested there, and requests here.

Having concurred in the State Court's factual findings, we must then determine whether the State Court's application of the governing constitutional principles, to those factual findings, was objectively reasonably. Although our analysis is somewhat different than that employed by the Minnesota Court of Appeals, we ultimately reach the same conclusion. Our analysis parts company with that of the Court of Appeals where the Court determined, in reliance upon Lidberg, that the State discharge provisions, which provide for the gradual release from commitment, "comport[] with due process under both the federal and state constitutions," id., citing Lidberg v. Steffen, supra at 283, since the statutory mechanism allowed a civilly committed person to obtain release, by demonstrating that he or she could successfully adjust to society,

while simultaneously permitting the State to protect public safety. The Court also observed that the Minnesota Supreme Court had found the presence of a provisional discharge "critical," because it was better suited to determining whether a person, who was so committed, was capable of returning to the community than was an adversarial Hearing. As a result, based upon the holding in Lidberg, the Court of Appeals found that there was no basis to conclude that the Petitioner's due process rights were violated when his request for a full discharge was denied.

In its opinion, the Court of Appeals stated that "[t]he [Minnesota S]upreme [C]ourt has held that 'Minn[esota] Stat[ute] §253B.13, subd[ivision] 15, * * * comports with due process under both the federal and state constitutions.'" In Re the Matter of Berry, supra at *3, quoting Lidberg v. Steffen, supra at 783. Absent, however, from this quotation is the Minnesota Supreme Court's expression that the statute, "**as applied**" to the facts in Lidberg, comported with Federal and State Due Process requirements. Id. at 783. Notably, in Lidberg, the patient, who challenged the constitutionality of the discharge provisions, had been found to still be mentally ill, and to be in need of supervision and treatment. The Court also determined that, if the patient did not continue to take his medication, then he would be a danger to himself or others. It was only in this context that the Minnesota

Supreme Court found that the gradual discharge provisions were reasonably related to the patient's original commitment.

While the Minnesota Court of Appeals did not exhaustively compare the circumstances of the Petitioner's case, with those presented in Lidberg, we are not persuaded that the Court erred in its analysis. As was the case in Lidberg, the Petitioner was found to be in need of supervision, in order to determine if his treatment, to that date, had given him such insight into his condition as to allow him to maintain abstinence and sobriety, and until that insight was demonstrated, the Petitioner was "still a danger to the public." In re the Matter of Berry, supra at *3. As the Court observed, in Lidberg:

> Based upon respondent's current condition, including his mental illness, his need for treatment and supervision, his inability to adapt to open society, his current dangerousness to himself, and the potential for danger to others if he does not continue to take his medication and abstain from the use of alcohol and illicit drugs, we conclude that requiring respondent to utilize the discharge provisions of Minn.Stat. §253.18, subd. 15, bears a reasonable relationship to his original commitment as [MID].

Lidberg v. Steffen, supra at 783.

Given human variability, no two factual circumstances, involving human traits and personalities, will be exactly the same, but we find the circumstances, which faced the Supreme Court in Lidberg, to be closely analogous, and not meaningfully distinguishable from

those presented here. While the Petitioner's mental illness was found to be in remission, that finding does not eradicate the need to supervise the Petitioner, and to gradually allow for his re-entry into the community-at-large. Indeed, given the consensus of the medical opinions -- those of Drs. Cronin and Kluznik -- that were expressed on this precise point, we find nothing to suggest that the denial of the Petitioner's request for a full discharge constituted "preventive detention." Reome v. Levine, 692 F. Supp. 1046, 1051 (D. Minn. 1988).[8]

---

[8]Reome v. Levine, 692 F. Supp. 1046 (D. Minn. 1988) is readily distinguishable. There, the petitioner was not found to be mentally ill, was capable of making an acceptable adjustment to open society, was no longer in need of inpatient treatment and supervision, but was "apt to be involved in criminal behavior in the future," and thus, dangerous to the public. Id. at 1050. Based on this finding of "dangerousness," the SCAP concluded that the patient was not entitled to discharge, and the Minnesota Court of Appeals upheld that decision as constitutionally permissible. The Court, in Reome disagreed, and reasoned that the commitment statute required a finding that a person be mentally ill, and be dangerous **as a result of that mental illness**, while the discharge provision did not require such a causal connection between the mental illness and the dangerousness, as it required a finding both that the patient was no longer mentally ill, and was no longer dangerous to the public. The District Court concluded that "[s]uch a requirement destroys the constitutional basis for confinement." Id. at 1051. Here, while the Petitioner contends that he was never mentally ill, or at least that he was not so at the time of his request for a full discharge, that is a contention which was properly rejected by the psychological/psychiatric experts who testified with respect to his full discharge release, and we find no clear and convincing evidence to the contrary in the Record on review.

The Petitioner's request for a full discharge was not rejected simply because he was an individual prone to substance abuse. Rather, he was determined to have a mental illness which was in remission, but which rendered him dangerous, particularly given his past history of substance abuse. Until he demonstrates the capacity to recognize his illness, so as to maintain abstinence and sobriety, a full release would be inconsistent with the State's responsibility to public safety. Accordingly, we conclude, as did the Minnesota Court of Appeals, that there is a reasonable relation between the nature and duration of the Petitioner's commitment, and the purpose behind that commitment. The Petitioner's commitment was continued so as to allow him time to gain the insight necessary to maintain his sobriety which, in turn, would permit his mental illness to remain in remission, and lessen the risk that he might be a danger to himself or others.

We further conclude that the application of the discharge statute to the Petitioner's circumstances is constitutional, since the Petitioner has demonstrated a continued need for supervision, in order to make a successful adjustment into society, and so as not to present an unreasonable danger to himself or others. In sum, the Petitioner is within the class of persons, who are identified by the commitment statute, and who constitute a dangerous risk to society, because his mental illness, and his dangerousness, are

causally related. Therefore, we recommend that the Petitioner's request for Habeas relief be denied, and that this case be dismissed with prejudice.

WHEREFORE, It is --

RECOMMENDED:

1. That the Respondent's Motion to Dismiss on procedural grounds [Docket No. 6] be denied.

2. That the Petition for Writ of Habeas Corpus [Docket No. 1] be denied.

3. That the case be dismissed with prejudice.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 7, 2003**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture

of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 7, 2003**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.